CLAIBORNE v. UNITED STATES.
No. 10118.

Circuit Court of Appeals, Eighth Circuit.
May 3, 1935.

Rehearing Denied June 10, 1935.

William L. Vandeventer, of Springfield, Mo. (Calvin, Vandeventer & Kimbrell, of Kansas City, Mo., on the brief), for appellant.

Thomas A. Costolow, Asst. U. S. Atty., of Kansas City, Mo. (Maurice M. Milligan, U. S. Atty., and Randall Wilson and Sam C. Blair, Asst. U. S. Attys., all of Kansas City, Mo., on the brief), for the United States.

Before STONE, SANBORN, and FARIS, Circuit Judges.

SANBORN, Circuit Judge.

The appellant was indicted for perjury, under section 231, title 18, U. S. C. (18 USCA § 231), and was tried, found guilty, and sentenced. From the judgment of conviction, he has appealed. (He will be referred to as the defendant.)

On August 12, 1933, at about 1 o'clock in the morning, Thomas B. Bash, the sheriff of Jackson county, Mo., with his wife, his deputy, Lawrence Hodges, and a little girl, were in an automobile in Kansas City, returning from an ice cream social. As they were driving south on Forest avenue between 34th street and Armour boulevard, they heard shooting, followed by screaming. The sheriff directed his deputy, who was driving, to stop the car. The car was stopped, and the sheriff, after taking from its case a riot gun which he carried in the car, stepped out of one door, as his deputy stepped out of the other. The sheriff's car was then about 50 or 60 feet from Armour boulevard. Just then a car swung around from the west on Armour boulevard into Forest avenue, and the occupants of this car commenced firing at the sheriff and his deputy. The sheriff returned their fire. The shooting still continued, but not from the car. A man came running toward the sheriff, shooting as he came. The sheriff leveled his gun to shoot him, and thereupon the man dropped his gun, threw up his hands, and screamed at the sheriff not to kill him. This man was Charles Gargotta. The sheriff backed him up against an apartment building on the northeast corner of Forest and Armour, at the same time keeping an eye on the gun that Gargotta had dropped. When Hodges approached, the sheriff directed him to pick up the gun. Hodges handed it to the sheriff, who placed it in his pocket. The gun was a .45 Colt automatic pistol, marked "Model of 1911, U. S. Army" on one side, and on the other "United States Property." Its serial number, according to Sheriff Bash, was 377,675.

The two men, in the front seat of the car, who had fired upon the sheriff and had thereafter been fired upon by him, were found to be dead. One was Fasone; the other Lascola. As the sheriff opened the door of their car, another automatic pistol, similar to that which had been used by Gargotta, fell from the dead hand of Fasone. The serial number had been filed off this gun. The sheriff took possession of it.

A short distance away from the immediate scene of the shooting was found the dead body of Ferriss Anthon, "well known alcohol dealer," who had been shot. Sheriff Bash had accidentally come upon the scene just as Anthon had been killed, to the evident annoyance of his killers. On Anthon's body was found a .38 Colt short-nosed revolver.

About thirty minutes after the shooting, a police officer by the name of Strean came upon the scene. He heard some one say that a man had run away and had passed between two nearby houses. Strean fol-

lowed the trail pointed out to him, and at the rear of one of these houses found another .45 Colt automatic pistol, of the same type as the gun used by Gargotta, lying upon the ground. He picked it up with his pencil in order not to destroy any finger prints, and tied it in his handkerchief. This gun he then turned over to the defendant, Leonard L. Claiborne, a police officer and detective, of Kansas City, who was his superior officer and a member of the homicide squad. Claiborne was at the scene of the shooting shortly after it occurred. This gun, delivered to Claiborne by Strean, will be called the "Strean gun." Another gun, of the same kind, was found in Gargotta's pocket by the police officers who took him into custody. This bore serial No. 69,791.

There were therefore four automatic pistols exactly alike except for serial numbers. Of these guns, two had been taken from Gargotta, one from Fasone, and one had been found by Strean. Obviously, the Strean gun had not been dropped by Gargotta, but had evidently been dropped by one of his associates who had fled from the sheriff.

Sheriff Bash took two of these guns to his office from the scene of the shooting, one Gargotta gun and the Fasone gun. Claiborne, after he received the Strean gun from Strean, unwrapped it and handled it for the purpose of unloading it, and then took it to the office of Sheriff Bash and turned it in to him. The gun found in Gargotta's pocket was also brought to the sheriff, as was the Anthon gun; so that when the guns were all collected in the sheriff's office early in the morning of August 12th, he had five guns in his possession, of which four were .45 Colt automatic pistols of the same model.

That same morning, shortly after he had delivered the Strean gun to Sheriff Bash, Claiborne returned for it for the purpose of taking it to police headquarters to be examined for fingerprints. He obtained from the sheriff what the sheriff says was the Strean gun, serial No. 504,567. Thereafter at about 8 o'clock of the morning of August 12th, a federal agent and Merle A. Gill, a ballistics expert, at the sheriff's request, went to police headquarters and obtained this gun. The serial number, according to Gill, was 504,567. Sheriff Bash then turned over all of the guns to Gill for testing. Gill ascertained that the bullets that killed Anthon were fired from the gun

with serial No. 377,675. This, according to the sheriff, was the same gun that Gargotta had used in firing at him. From the testimony of Sheriff Bash and others, it appears that gun No. 377,675 was never out of the possession of the sheriff until it was turned over to Gill for testing; that Claiborne never had possession of it at any time; and that the only one of these guns that he did have possession of was No. 504,567, the Strean gun.

Gargotta was indicted and tried for murder in the state court. Claiborne, upon the trial, testified that when he obtained from the sheriff what purported to be the Strean gun on the morning of August 12th, he took it directly to police headquarters, and that, before it was turned over to Gill and the federal agent, he made out a tag for it, copying the serial number of the gun onto the tag; that he did not attach the tag to the gun, but placed the tag in a drawer in his office. When produced, this tag read as follows:

"Held for Court.
"Dist. D. D.    Date Aug. 12, 1933
    No.———

    Where
"From          Taken  Armour & Forest
    Whom
"Charge  Murder
"By Whom Claimed  Unknown
"Property 1 .45 cal Army Colts Auto.
    1911 model #377675
"Estimated Value loaded .45 Rem. shell
                empty .45 Rem. shell
"Arresting Officer  Claiborne & Eldredge
    "T. J. Higgins, Officer in Charge.
"10M–5–2–33"

[Reverse:]

"This gun found at scene of murder of Anthon, LaScola and Fasone, Armour & Forest, Aug. 12–33. Found by Jack Strean."

Claiborne also testified in the state court that on August 14, 1933, he made out his report of the occurrences of the morning of August 12th. The report is as follows:

"Gang Murder and Shooting by Sheriff Bash, Aug. 12, 1933, at about 1:15 AM, Armour & Forest. At 1:25 AM, Aug. 12, 1933, received a call to go to Armour & Forest and investigate a murder; arrived at scene at about 1:40 AM. Found a body in front of Steuben Club on parkway; body identified as Ferris Anthon, well known alcohol dealer. Anthon had been

shot a number of times with what appeared to be .45 caliber bullets; body was lying three feet west of entrance to Steuben Club, head lying east near auto identified as belonging to Anthon.

"Found two bodies in Buick auto on Forest about 10 feet north of north curb line of Armour; car was five or six feet out into street and headed northwest. The driver of this car who was dead behind the wheel was identified as Sam Lascola, alias Sam Hogg. The other body was in front seat beside LaScola and was identified as Steve Faconia, alias Steinei. Both men had been killed by several charges of buck shot in head and chest by Sheriff Bash and Deputy Sheriff Hodges when they had attempted to escape from the scene of the Anthon murder.

"Bash and Hodges captured Charles Gargotta at scene, but had left before Homicide Squad arrived. Dr. Owens, Coroner, and Deputy Coroner Berner were at scene and ordered the bodies sent to the Passantino Funeral Home. A search was made for witnesses but owing to the immense crowd none could be found.

"Officer Jack Strean turned over to me a .45 caliber Colt's automatic, 1911 model army issue, #377675. This gun had one loaded Remington shell in the barrel; this shell was extracted and placed in the clip which was empty. Gun was taken to Sheriff's office at about 3:00 AM and turned over to Sheriff Bash for inspection, also one empty .45 caliber Remington shell. Gun later taken to Police Headquarters for inspection and record, and was tagged in Identification Bureau at 8:15 am. Operative Turo from Federal Bldg. and Merle Gill, ballistic expert, call for gun about this time and tag taken from and kept as record. Gun was returned to Sheriff's office by the above mentioned officials. Strean stated he found the gun between the second and third houses going east from Forest on the north side of Armour. We later made additional searches but did not find any other guns.

"This case being handled by Sheriff's office and we have not made any arrests and this concludes our investigation. Aug. 14, 1933.

"L. L. Claiborne & Wm. Eldredge, Homicide Squad."

There was a direct conflict between the testimony of Sheriff Bash, which is contained in the record before us, and the tag and report of Claiborne. According to Sheriff Bash, gun No. 377,675 dropped from the hand of Gargotta after he had emptied the gun. The chamber was open, as is the case with an automatic pistol of this type after the last shell has been fired. According to the tag and report of Claiborne, No. 377,675 was the gun picked up by Officer Strean, and at the time it was handed to Claiborne it was not empty but had a loaded shell in the barrel. If the facts stated in the tag and report of Claiborne were correct, it is impossible that Gargotta could have been in possession of this gun at the time of the shooting, or that it could then have been empty.

Gargotta was not convicted of murder in the state court.

The four Army automatic pistols which have been referred to were property of the United States which had been stolen from the National Guard Armory in Kansas City. The government had a right to be and it was interested in them and in finding out who stole them and who had had possession of them. A federal grand jury, which was in session in June, 1934, after the trial of Gargotta in the state court, undertook an investigation of the charge that Gargotta had in his possession on August 12, 1933, two automatic pistols belonging to the United States, knowing them to have been stolen. With other witnesses who knew about these guns, Claiborne was subpoenaed to appear before the grand jury as a witness. He appeared and testified with respect to what had occurred on the morning of August 12, 1933. He told of the receipt by him of the Strean gun, its delivery to Bash, his (Claiborne's) return for the gun, the delivery by Bash of the gun to him (Claiborne), and the making out of the tag by him at police headquarters. He identified the tag which was shown to him. He was also questioned before the grand jury about a conversation alleged to have taken place at the home of Merle Gill on April 28, 1934, shortly before the trial of Gargotta in the state court for murder. Gill had testified before the grand jury that Claiborne had come to his house on April 28, 1934, and had asked him for the number of the Strean gun, after inquiring of Gill whether he had the numbers of the guns in the Gargotta case. Gill stated that Claiborne said to him, "I am in a sort of a jam and they have been giving me hell because I

686

haven't the numbers for my records," and, "If you will give me that number it will help me out a whole lot." Gill testified that he gave Claiborne the number of the Strean gun, namely, 504,567. Claiborne's version of the Gill conversation amounted to the virtual contradiction of Gill's testimony.

The grand jury returned an indictment against Gargotta for having in his possession on August 12, 1933, United States Army guns Nos. 377,675 and 69,791, knowing them to have been stolen. (No. 69,791 was the gun found in Gargotta's pocket.)

An indictment was then returned against Claiborne, charging him with having perjured himself before the grand jury.

This indictment contained two counts, with two assignments in each count. The first count related to Claiborne's testimony given on June 5, 1934, and the second to his testimony given on June 6, 1934. The substance of the testimony was the same on both days. It had reference to the Strean gun and the tag and to the conversation with Gill on April 28, 1934. In each count of the indictment the first assignment charged that he perjured himself in his testimony with respect to the tag, and the second assignment charged him with perjury in connection with his testimony as to the conversation with Gill. The first count is typical of both counts, and will be found in the footnote.[1]

---

[1] Count I: The grand jurors of the United States of America, duly and legally chosen, selected, summoned, and drawn from the body of the Western District of Missouri, and duly and legally impaneled, sworn, and charged to inquire of and concerning crimes and offenses against the United States of America in the Western District of Missouri, upon their oaths present and charge that heretofore, to wit, on the 5th day of June, 1934, at Kansas City, Jackson county, Mo., and within the jurisdiction of this court, before the grand jury of the United States District Court for the Western District of Missouri, which was then and there duly and legally chosen, selected, summoned, and drawn from the body of the Western District of Missouri, and duly and legally impaneled, sworn, and charged to inquire of and concerning crimes and offenses against the United States of America in the Western District of Missouri, a certain hearing and investigation was then and there pending and being duly and legally prosecuted and conducted by the grand jury last aforesaid of and concerning a certain criminal charge, accusation, and matter made and presented to the grand jury last aforesaid by Randall Wilson, Assistant United States Attorney for the Western District of Missouri, wherein one Charles Gargotta was accused of receiving, concealing, and retaining in his possession property of the United States, that is to say, two United States Army automatic pistols stolen from the United States of America, well knowing the same to have been stolen, in violation of section 101, title 18, United States Code Annotated (Criminal Code, Section 48), the grand jury last aforesaid then and there having competent authority to conduct and pros-

ecute the hearing and investigation, aforesaid, one Leonard L. Claiborne then and there appeared in his own proper person as a witness and was then and there duly sworn and took his oath before the grand jury last aforesaid, that the evidence which he, Leonard L. Claiborne aforesaid, should give and depose to and before the grand jury last aforesaid touching the charge, accusation, and matter then pending and under investigation as aforesaid should be the truth, the whole truth, and nothing but the truth, which said oath was then and there duly and lawfully administered to him, the said Leonard L. Claiborne, by Townley Culbertson, who was then and there the duly appointed, qualified, and acting foreman of the grand jury last aforesaid, he, the said Townley Culbertson, then and there having full power and competent authority to administer said oath as aforesaid to Leonard L. Claiborne aforesaid in that manner and behalf.

(Assignment No. 1) And that upon said hearing and investigation before the grand jury last aforesaid, the date whereon a certain tag, card, and paper writing hereinafter set forth was made out, filled in, and written, then and there became and was a material and relevant matter and question, relating to the criminal charge against Charles Gargotta aforesaid, and that Leonard L. Claiborne aforesaid, at the hearing and investigation aforesaid and before the grand jury last aforesaid, and upon his oath aforesaid, while under and contrary to the same, then and there willfully, falsely, corruptly, and feloniously did, in response to the questions hereinafter set forth, duly and legally propounded to him, testify, depose, and swear of and concerning the tag, card, and paper

Claiborne demurred to the indictment. The demurrer was overruled. He filed a plea in abatement, which was denied. He entered a plea of not guilty and went to trial.

If the government's evidence upon the trial was to be believed, Claiborne never had possession of gun No. 377,675 at any time, he never copied the serial number from that gun upon any tag, the tag which he made out was not made out by him on August 12, 1933, as he testified, and the blank form of tag which he used was not even in existence on that day. It was one of a shipment of tags which was delivered to the police department of Kansas City in October, 1933. Furthermore, the government's evidence showed that Claiborne learned from Gill on April 28, 1934, the number of the Strean gun, so that he knew that the number of that gun was not 377,-675, but was 504,567. It is obvious that if the government's witnesses upon the trial of Claiborne told the truth, Claiborne's testimony before the grand jury as to the time when the tag was made out and as to the conversation with Gill was utterly false, and the jury which tried him was fully justified in finding that he knew that it was false and had perjured himself. Moreover, the government's evidence showed that at the time Claiborne was arrested he made statements and admissions to the arresting officers which were utterly inconsistent

writing aforesaid, which is and was then and there in words and figures as follows:

"Gov't's Exhibit 1, F. Mc
"Dennison Mfg. Co., U. S. A., E. C.
        "Held for Court
"Dist. D. D.    Date Aug. 12, 1933
    No. ——
        Where
"From Whom Taken  Armour & Forrest
"Charge  Murder
"By Whom Claimed  Unknown
"Property  1  .45 Cal. 1911 Model Army Colts Auto #377675
                1 loaded .45 Rem. Shell
"Estimated Value 1 empty .45 Rem. Shell
"Arresting Officers  Claiborne & Eldredge
        "T. F. Higgins, Officer in Charge.
"10M–5–2–33
"This gun found at scene of murder of Anthon Loscola & Faconia, Armour & Forrest Aug. 12–33– found by Jack Strean (Ex–21)."

—and was then and there first shown and exhibited to him by Randall Wilson aforesaid, as follows (said questions then and there being propounded by Randall Wilson aforesaid and the answers hereinafter set forth being then and there given by Leonard L. Claiborne aforesaid):

"Q1. Is that ticket in your handwriting? A1. It is.

"Q2. When did you write that? A2. I wrote it on the morning of August 12.

"Q3. Look at that ticket closely, will you please? Are you sure that is the same ticket that was produced down there at that trial? A3. I looks like the same ticket.

"Q4. Is everything in your handwriting on there? Observe it closely, Mr. Claiborne. A4. I did not make that notation in the corner and I did not make this here.

"Q5. This exhibit number here. I want you to look at that very closely and tell this grand jury whether or not that is the same exhibit as exhibit 21 used in the trial of Charles Gargotta in the Circuit Court of Jackson County, wherein he was charged with murder? A5. I would say it is the same ticket, or tag.

"Q6. It is the same tag? A6. Yes, sir.

"Q7. That is all in your handwriting except the number that I referred to as being marked exhibit by the stenographer here? A7. Yes, sir.

"Q8. All written at the same time? A8. Yes, sir.

"Q9. On the same date? A9. Same day.

"Q10. And on what date did you say? A10. On the morning of the 12th.

"Q11. What time? A11. That would be between 8:15 and 8:30 A. M.

"Q12. What year and what month was that? A12. It was August, 1933.

"Q13. What day of the week was it, do you remember? A13. No, I don't recall the date.

"Q14. And you wrote on the back— that writing on the back of the tag? A14. Yes; I wrote this later in the morning."

—whereas, in truth and in fact, the tag, card, and paper writing aforesaid was not made out, filled in, or written by Leonard L. Claiborne aforesaid on the morning of August 12, 1933, but was, on the contrary, thereafter on a day following October 1, 1933, the exact day being to the grand jurors unknown, made out, filled in, and written by him, the said Leonard L. Claiborne.

And the grand jurors aforesaid, upon their oaths aforesaid, do further present and charge that at the time Leonard L. Claiborne aforesaid testified, deposed, and sworn as aforesaid, he, the said Leonard L. Claiborne, then and there did not believe his testimony aforesaid to be true, and then and there well and fully knew that he had not made out, filled in, or written the tag, card, and paper writing aforesaid on the morning of August 12,

with any theory of his innocence and were virtual confessions of his guilt. At the trial, Claiborne at no time conceded that he had perjured himself in his testimony before the grand jury. He denied having made any admissions of guilt. His defense was that his testimony before that body was true or at least was believed by him to be true.

At the close of all of the evidence, the court denied a motion for a directed verdict and submitted the case to the jury, which found Claiborne guilty upon both counts of the indictment. He was sentenced to serve four years under each count and to pay a fine, the sentences to run concurrently.

Upon this appeal, the errors assigned relate to (1) the indictment; (2) the plea in abatement; (3) the sufficiency of the evidence; (4) the charge of the court.

### The Indictment.

The defendant contends that his demurrer to the indictment should have been sustained because the materiality of the alleged perjured testimony to the matter under investigation by the grand jury is not directly charged, and because the allegations as to the second assignment in each count are defectively vague, uncertain, and indefinite.

It will be noted that the indictment informed the defendant that certain matters were material to the investigation which

---

1933, aforesaid, and that his testimony aforesaid then and there constituted and was willful, false, corrupt perjury.

(Assignment No. 2) And the grand jurors aforesaid, upon their oaths aforesaid, do further present and charge that upon said hearing and investigation before the grand jury last aforesaid, it became and was a material and relevant question and matter relating to the criminal charge, accusation, and matter aforesaid against Charles Gargotta aforesaid, to ascertain whether at a time a few days before the trial of a certain criminal cause in the circuit court of Jackson county, Mo., styled state of Missouri versus Charles Gargotta, wherein the said Charles Gargotta was then and there charged with murder, Leonard L. Claiborne aforesaid went to the home of Merle A. Gill, a ballistics expert, in Kansas City, Jackson county, Mo., and then and there told and informed the said Merle A. Gill that he, Leonard L. Claiborne aforesaid, did not have the number on a certain United States Army automatic pistol, at the time held as evidence for the trial of the criminal cause styled State of Missouri v. Charles Gargotta, and then and there told and informed the said Merle A. Gill that he, Leonard L. Claiborne aforesaid, did not have the number aforesaid of the pistol aforesaid, and then and there requested the said Merle A. Gill to furnish him with the number of said United States Army automatic pistol, and that Leonard L. Claiborne aforesaid, at the hearing and investigation aforesaid, and before the grand jury last aforesaid, and upon his oath aforesaid, while under and contrary to the same, then and there willfully, falsely, corruptly, and feloniously did, in response to the questions hereinafter set forth, duly and legally propounded to him, testify, depose, and swear as follows (said questions then and there

being propounded by Randall Wilson aforesaid and the answers hereinafter set forth being then and there given by Leonard L. Claiborne aforesaid):

"Q1. Mr. Claiborne, I want to ask you a question and want you to think pretty carefully before you answer it. Now, is it not a fact just a few days before this trial you went to Mr. and Mrs. Gill's home—Mr. Gill was sick, was he not, at that time? A1. No, he was not sick. He did not say anything about being sick.

"Q2. You went to Mr. and Mrs. Gill's—Gill is a ballistics expert, is he not? A2. Yes, sir.

"Q3. And you told him at that time that you had not taken the numbers and did not know the numbers of that gun and asked him for them, and that Mrs. Gill wrote them down on a piece of paper and gave them to you, the numbers of that gun? A3. I did not. I went to Mr. Gill's house and I will tell you why. I can prove it, if necessary. There had been a murder of a young boy by the name of Allenbaugh in Kansas City, Kansas, a few days before this thing came up and Sheriff Becker, who was handling the case, of Wyandotte County, was over here that morning talking to me about this case, and Mr. Gill had one of the bullets; in fact, the only bullet that had been found in that murder,—the murder, no doubt, was hatched on the Missouri side, and after that young Allenbaugh's car was found at 15th and Elmwood—and that reached on back; I could go into it farther—but, anyway, the suspect was on the Missouri side and we had a good suspect, not only with that case, but it all comes together with the * * * murders to this department and was my case and after that Mrs. Fixley collected $26,-000 insurance on her husband's death and young Fixley and Allenbaugh boy were very close friends, were together every

the grand jury was making, and that he had given certain testimony which, upon its face, showed that it was directed to the particular matter asserted to be material. It is contended that the indictment should have gone further and should have charged that the testimony so given by the defendant was material to the matter which had been alleged to be a material matter.

The purpose of an indictment is to apprise the accused of the crime charged against him with such reasonable certainty that he can make his defense and not be taken by surprise by the evidence offered at the trial, and can be protected, after judgment, against another prosecution for the same offense. Berger v. United States, 295 U. S. 78, 55 S. Ct. 629, 79 L. Ed. —, opinion filed April 15, 1935. When an indictment does that, every useful purpose is accomplished. Beyond the possibility of any doubt, this indictment advised Claiborne that he was charged with having perjured himself before a certain grand jury, at a certain time, as to certain material matters, in the giving of certain testimony obviously pertinent to those matters. There was no possibility of his being mis-

day, and young Allenbaugh made statement to a number of witnesses that he had accepted $3,000 and naturally our suspects ran back to Fixley because that matter had never been cleared up and always had our suspicions. There is a matter of about $6,000 in rewards, if that case is cleared up, to my knowledge, and I was working hard to get something on him and I went to see Merle Gill and I explained to him and I told him, 'Merle, if you will help me make this case I will split the reward three ways; it will be you and I and my partner.' It was a nice reward and I had the gun. If you want me to tell all of this, say so—

"Q4. I want to hear this story. I want to know if it is not a fact that when you were out there three or four days before this trial that you did not tell Mr. and Mrs. Gill that you did not have the number on that gun and that you asked them for it and Mrs. Gill used a telephone memorandum pad, a piece of paper on a telephone memorandum pad and wrote that number on it and gave it to you? Is that right, or not? A4. That is not right; not a word of it is correct. The only time I saw Mrs. Gill was when I went in the house I went through the room—I went back and talked over the business in the den and while I was in there Mrs. Gill was in the kitchen and kept screaming to her husband to hurry up; you are going to be late for your appointment—he had an appointment with a Government agent to go to Minneapolis or some place north —and that is the only time I ever heard Mrs. Gill speak. I did not see him except only one night and she was busy with some lunch for Mr. Gill and kept hollering to come and eat his lunch; that he would be late for his appointment; that was the full extent of that visit."

And the grand jurors aforesaid, upon their oaths aforesaid, do further present and charge that Leonard L. Claiborne aforesaid at the time he made the statements aforesaid then and there well and fully knew that they were, as a matter of fact, false and untrue in that, and for the reason that Leonard L. Claiborne aforesaid then and there well and fully knew that, at the time to which he referred in his testimony aforesaid, he did in fact go to the home of Merle A. Gill, a ballistics expert, in Kansas City, Jackson county, Mo., and did then and there tell and inform the said Merle A. Gill that he, Leonard L. Claiborne aforesaid, did not have the number on a certain United States Army automatic pistol, at the time held as evidence for the trial of the criminal cause styled State of Missouri v. Charles Gargotta and did then and there tell and inform the said Merle A. Gill that he, Leonard L. Claiborne aforesaid, did not have the number aforesaid of the pistol aforesaid, and did then and there request the said Merle A. Gill to furnish him with the number of said United States Army automatic pistol.

And the grand jurors aforesaid, upon their oaths aforesaid, do further present and charge that at the time Leonard L. Claiborne aforesaid so testified, deposed, and swore as last aforesaid, he, the said Leonard L. Claiborne, then and there did not believe the statements aforesaid to be true, and then and there well and fully knew that his testimony aforesaid then and there constituted and was willful, false, and corrupt perjury.

And so the grand jurors aforesaid, upon their oaths aforesaid, do present and charge that Leonard L. Claiborne aforesaid, on the 5th day of June, 1934, at Kansas City, Jackson county, Mo., in the Western Division of the Western District of Missouri, and within the jurisdiction of this court, before the grand jury last aforesaid, and upon the hearing and investigation aforesaid, did in the manner and form aforesaid willfully, falsely, corruptly, and feloniously commit willful and corrupt perjury.

Contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America.

led as to the perjuries charged against him, and no possibility of his again being prosecuted for giving the same false testimony.

"The materiality of a perjured statement may be made to appear either by an allegation of its materiality * * * or by pleading facts which of themselves show its materiality." Berry v. United States (C. C. A. 9) 259 F. 203, 205; Markham v. United States, 160 U. S. 319, 325, 16 S. Ct. 288, 40 L. Ed. 441; Hendricks v. United States, 223 U. S. 178, 184, 32 S. Ct. 313, 56 L. Ed. 394; Ammerman v. United States (C. C. A. 8) 185 F. 1; United States v. Salen (D. C. S. D. N. Y.) 216 F. 420; United States v. Seymour (D. C. Neb.) 50 F.(2d) 930, 940.

The allegations of this indictment as to the materiality of the false testimony are sufficient. The second assignment is not subject to the criticism which the defendant makes of it. He was fully advised as to what testimony of his before the grand jury with respect to the conversation with Merle Gill was claimed to be false.

Moreover, section 269 of the Judicial Code, as amended (28 U. S. C. § 391, 28 USCA § 391) would preclude a reversal for mere formal defects in an indictment which did not affect the substantial rights of the defendant. Berger v. United States, supra.

### The Plea in Abatement.

The basis for this plea was, in substance, that while the grand jury was pretending to inquire into the matter of the stolen guns possessed by Gargotta, they were in fact investigating Claiborne for the purpose of determining whether he had perjured himself in the state court upon the trial of Gargotta for murder.

The court below refused to hear any testimony to substantiate the allegations of the plea, upon the ground that the plea was obviously without merit.

It requires no citation of authority to demonstrate that the federal grand jury was without power to investigate violations of the laws of Missouri. The indictment charged, and the government was offering to prove upon the trial, and subsequently did prove, that the grand jury were investigating Charles Gargotta for having possession of stolen government property. The court below was not required to receive evidence to show that the grand jury had made an investigation that it had no power to make. Claiborne was charged with being, and was, a material witness in an investigation relating to the possession of the guns claimed to have been in Gargotta's possession on August 12, 1933, and was subpœnaed to appear before the grand jury. There were two courses open to him. If his testimony would incriminate him (and he alone knew whether it would), he had the privilege of refusing to testify, and if he had properly refused, no proceedings could have been taken against him. Or he could have testified truthfully. There was nothing in the situation, assuming the facts stated in his plea in abatement to be true, which would grant him a license to commit perjury. If he testified before the grand jury as to any material matter, and willfully falsified, then he perjured himself. If he had the right to refuse to testify on the ground that his testimony would incriminate him, that right was personal to him. No one could exercise it for him, and if he did not exercise it, he waived it.

"The privilege of silence is solely for the benefit of the witness and is deemed waived unless invoked. U. S. ex rel. Vajtauer v. Commissioner of Immigration, 273 U. S. 103, 113, 47 S. Ct. 302, 71 L. Ed. 560." United States v. Murdock, 284 U. S. 141, 148, 52 S. Ct. 63, 64, 76 L. Ed. 210, 82 A. L. R. 1376.

But a claim that Claiborne's disclosure before the grand jury might lead to prosecution by the state would not have justified his refusal to give testimony, under the Fifth Amendment to the Constitution. United States v. Murdock, supra. If it would not have justified his refusal, the fact that he had previously perjured himself in the state court would not prevent the grand jury from indicting him if he again perjured himself before them. He had violated no law of the United States at the time he was called as a witness. He was not an accused. If he was to be regarded as a prospective perjurer, on the theory that "one who rides a tiger cannot dismount," it must be remembered that the immunity afforded by the Fifth Amendment relates to the past. It is not a license to the person testifying to commit perjury. Glickstein v. United States, 222 U. S. 139, 142, 32 S. Ct. 71, 56 L. Ed. 128.

The following cases from state courts support this view: State v. Faulkner, 175 Mo. 546, 614, 615, 75 S. W. 116; State v. Lehman, 175 Mo. 619, 627–629, 75 S. W. 139; Harden v. State, 85 Tex. Cr. R. 220,

211 S. W. 233, 240, 4 A. L. R. 1308; Commonwealth v. Turner, 98 Ky. 526, 33 S. W. 88, 89; Mackin v. People, 115 Ill. 312, 3 N. E. 222, 224, 225; State v. Turley, 153 Ind. 345, 55 N. E. 30; Chamberlain v. People, 23 N. Y. 85, 88, 80 Am. Dec. 255.

The suggestion that the facts stated in the plea in abatement were sufficient to constitute an entrapment of Claiborne is without merit, since entrapment is a defense, and cannot be availed of by such a plea. United States v. Pappagoda (D. C. Conn.) 288 F. 214; Sorrells v. United States, 287 U. S. 435, 53 S. Ct. 210, 77 L. Ed. 413, 86 A. L. R. 249.

There was no error committed by the court below with respect to the plea in abatement.

### The Evidence.

It is contended that the government's testimony fell short of proving that the evidence given by Claiborne before the grand jury was material to the charge or accusation or matter under investigation.

The facts which have already been recited show that the contrary is true. If Claiborne told the truth, Bash was clearly mistaken as to the serial number of the gun which was dropped by Gargotta at the time of the shooting. Claiborne's testimony as to the time that the tag was made out bore directly upon the question of what guns Gargotta possessed. The conversation at the house of Gill on April 28, 1934, bore upon the question of the existence of the tag and the time when Claiborne made it. If Claiborne made the tag on August 12, 1933, he knew on April 28, 1934, the number of the gun that he had at police headquarters on the morning of August 12, 1933, and had no occasion to ask Gill for the number. If he asked for the number of the gun on April 28, 1934, it was a fair inference that he had not made out the tag when he said he did, but was making inquiry for the purpose of manufacturing evidence in aid of Gargotta.

The conversation at the home of Gill on April 28, 1934, also bore directly upon Claiborne's credibility as a witness. If the conversation with Gill was as Gill stated, then Claiborne's testimony as to his having made out the tag on August 12, 1933, was well-nigh incredible. If the grand jury believed Gill, they were justified in disregarding Claiborne's evidence bearing upon the guns of Gargotta.

"* * * A false statement by a witness in any of the steps, though not relevant in an essential sense to the ultimate issues pending before the grand jury, may be material, in that it tends to influence or impede the course of the investigation. This materiality has been recognized by the courts." Carroll v. United States (C. C. A. 2) 16 F.(2d) 951, 953; United States v. McGovern (C. C. A. 2) 60 F.(2d) 880, 889. This court has already ruled that testimony affecting the credibility of a witness is material. "It bears on every issue involved as to which such witness gives testimony, and that which impairs credibility is material in the highest degree." Williams v. United States (C. C. A. 8) 3 F. (2d) 129, 135, 41 A. L. R. 328.

The evidence given by Claiborne before the grand jury which was made the basis of the indictment was material and, as has been pointed out, there was abundant testimony to justify a finding that it was knowingly false.

### The Charge of the Court.

The defendant criticizes three excerpts from the court's charge to the jury.

The first statement to which exception was taken is as follows: "Very earnestly, gentlemen, I ask you to decide this case, as I am sure you will. I think it is not a difficult case to decide. I think that you can decide it soon. I ask you to do that, if you can."

After an exception had been taken to this, on the ground that the instruction was coercive, the court modified it as follows: "Well, gentlemen, if there is any doubt about that, let me say I still hope that you will decide the case tonight if possible. When I say 'if possible' I mean, of course, consistently with a full consideration of the discharge of your duties and a full consideration of the case to the extent that it requires consideration."

The second statement excepted to is: "What I have said touching the first assignment in the first count of the indictment is true also touching the second assignment contained in the first count of the indictment. In other words, if you find the defendant guilty as to either of the assignments set out in the first count of the indictment, then you will find the defendant guilty as charged in the first count of the indictment, even although you might not find him guilty of the other assign-

ment contained in the first count of the indictment."

The ground of exception was that this statement permitted the jury to convict the defendant though part of them might think him guilty of one assignment, and part might think him guilty of the other assignment. The court then instructed the jury as follows: "I do not think that what I said to the jury can possibly be so interpreted, but if there is any doubt about it, then I say to you gentlemen that before the defendant can be found guilty, for example, as to the first count of the indictment, then all of the jury must agree that he was guilty of one or the other of the assignments of perjury set out in that count."

The third statement excepted to was this: "One man can, if he wants to do that sort of a thing, prevent a decision of a case, but the kind of men that we call as jurors in this court are men who understand that cases must be decided one way or the other."

Upon exception being taken to this statement, the court said: "Well, gentlemen, I repeat what I said. I do hope that you will decide the case soon, if you can do so conscientiously. I do think that every jury should, if possible, agree so that cases can be decided. It is true that one member of any jury can, if he wills to do so, prevent a verdict. I hope that no man upon this jury will take this attitude, but if he does do so and conscientiously does do so, then he has a right to do so."

When these statements made by the court to the jury are considered with their modifications after exception, the suggestion that they were coercive or misleading is obviously frivolous. No juror could have understood, from what was said, that he was asked to lay aside his honest convictions in order to bring about an agreement, or that he was to violate his oath as a juror, or that the verdict of the jury as to any offense charged in the indictment could be less than unanimous. The court properly emphasized the desirability of an agreement being reached as soon as that could properly be done. No opinion was expressed as to what the verdict should be. The case was tried during a time of terrific heat. One juror was prostrated during the trial; an alternate had taken his place; and the court was faced with the possibility that others might be prostrated, causing a mistrial. But, regardless of temperatures and surrounding conditions, we think the charge of the court was in all respects full, fair, and accurate. Cases dealing with instructions given to juries which have failed to agree after the submission of a case, in order to bring about an agreement, are not in point. The court below is entitled to commendation for the manner in which the trial was conducted. The defendant had his full day in court. He was represented by able counsel. His rights were fully protected. The evidence against him was strong and convincing. The jury were justified in resolving the issues against him.

The judgment is affirmed.