**UNITED STATES v. FIELD et al.**

Nos. 300–302, Dockets 22116–22118.

United States Court of Appeals
Second Circuit.

Argued Sept. 14, 1951.

Decided Oct. 30, 1951.

Writ of Certiorari Dismissed Jan. 7, 1952.
See 72 S.Ct. 303.

Frank, Circuit Judge, dissented in part.
See also 190 F.2d 554; 190 F.2d 556.

Mary M. Kaufman, of New York City (Victor Rabinowitz, of New York City, on the brief), for appellants Frederick V. Field and W. Alphaeus Hunton.

Charles Haydon, of New York City, for appellant Dashiell Hammett.

Roy M. Cohn and James B. Kilsheimer III, Asst. U. S. Attys., both of New York City (Irving H. Saypol, U. S. Atty., and Robert Martin, Asst. U.S. Atty., both of New York City, on the brief), for the United States, appellee.

Before CHASE, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This appeal, from three summary orders of contempt, is an aftermath of the affirmance by the Supreme Court in Dennis et al. v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, of the conviction of eleven officers of the Communist Party of America for violation of the Smith Act, 18 U.S.C. § 2385. Those defendants had been enlarged on bail in the sum of $20,000 each, furnished by the Bail Fund of the Civil Rights Congress of New York pending appeal to this court and, after affirmance, United States v. Dennis et al., 2 Cir., 183 F.2d 201, pending certiorari by Circuit Justice Jackson, Williamson et al. v. United States, 2 Cir., 184 F.2d 280, because of the substantial issue of law involved. The present appellants are three of the five trustees of that Fund. When the District Court received the mandate of final affirmance by the highest court on July 2, 1951, it ordered the surrender of the defendants, to commence service of their sentences of imprisonment. Seven appeared and were duly incarcerated. Four did not; and when bench warrants did not produce them on the next day, their bail was declared forfeited. The court then directed the appearance before it of the bondsmen and trustees and officers of the Bail Fund which had acted as surety for the fugitives. Appellants appeared and were examined by the court and by the United States Attorney at hearings occupying several days—Field on July 3 and 5, Hunton on July 6 and 9, and Hammett on July 9. All refused to answer certain

questions and to produce certain books and records of the Bail Fund and were cited for contempt, Field on July 5, and the others on July 9. Field was sentenced to imprisonment for ninety days or until such time as he might purge himself of his contempt. The others were sentenced for six months, with like provision for purging themselves.

These are the orders we have for review. Certain later proceedings should, however, be noted. Field applied to Chief Judge Swan for bail pending appeal, who eventually denied the application in a detailed opinion reported in United States v. Field, 2 Cir., 190 F.2d 554; and this was concurred in by Judge L. Hand in denying similar applications by Hammett and Hunton, United States v. Hunton et al., 2 Cir., 190 F.2d 556. Thereafter all three made like petitions before Justice Reed as Acting Circuit Justice for the circuit. Justice Reed denied the petitions in a comprehensive opinion dated July 25, 1951. 193 F. 2d 86. The opinions of these several judges cover with meticulous care a substantial part of the case now before us on this full review of the entire record, and we have been greatly aided by the clear statements of the law there set forth.

Meanwhile Field, having refused to comply with directions of a federal grand jury, was found in contempt and sentenced to an additional term of imprisonment of six months—an order we are reviewing in the companion case herewith of United States v. Field, 2 Cir., 193 F.2d 109. A fourth trustee, Abner Green, was also held in contempt of directions both of a grand jury and of the court in proceedings decided in the third appeal herewith, Green v. United States, 2 Cir., 193 F.2d 111. Application for a special session of the court during the summer recess having been granted, these three appeals were heard at a single sitting in September. It is a matter of regret to the court that some delay in disposing of the cases has occurred, due to illness in the court, pressure of judicial work upon the opening of the regular October term, and the gravity of the issues involved.

The record before us shows that when the judge undertook his inquiry into the escape of the fugitives, there were placed before him the documents filed in court when the bonds were given. These included, first, the "Agreement and Deed of Trust," dated originally September 16, 1946, and amended September 26, 1949, and signed by the five trustees, with the fifth trustee, Robert W. Dunn, signing a second time as "Treasurer." This provided that the Fund was to accept both loans and gifts—for which certificates of deposit and receipts were to be given the lenders and contributors respectively—to be employed in posting bail "for the benefit of strikes, and of those whose civil rights are threatened or under attack." Second, there was a statement under oath, dated November 3, 1949, by three trustees—Field, Dunn, and Hunton—reciting specific authority to Dunn to post the Government Bearer bonds, purchased with moneys given "by diverse persons," as collateral security for bail for the eleven specifically named defendants. It also stated that "in addition to the general authroity [sic] contained in the annexed Agreement and Deed of Trust, all the trustees duly adopted a resolution at a meeting of the trustees held on July 22, 1948, reading as follows: Resolved that the trustees hereby authorized the use of the bail fund for such bail as might be required in the case of the Communist leaders indicted under the Smith Act on July 20, 1948, at all stages of the proceedings and until the case is finally terminated." And third, there were the formal "Bonds on Appeal" in the penal sum of $20,000 conditioned on the appearance of the particular defendant named whenever required by law or order of the court and signed by the particular defendant as Principal and Dunn as Surety.

At the hearing on July 3, Field appeared voluntarily without waiting to be subpoenaed. Advised that the purpose of the hearing was to make inquiry of the sureties under oath as to their knowledge of the whereabouts of the defendants whom the court was seeking—an inquiry "to assist the Court in effecting service of its process, which has been issued"—he was

duly sworn and proceeded to testify. At first he answered readily, stating that he was a trustee of the Fund, that he had paid several visits to the headquarters of the Communist Party during the previous week in order to assure himself that the defendants would appear, and that during one of these visits he had seen at least two of the four who had failed to appear. His first refusal to answer was to a question as to the source of the funds which the group had used in posting the bond in question. He was then asked a series of questions pertaining to the last time he had seen the fugitives, the functioning of the Bail Fund, its officers, and the records it kept. These he answered, with the exception of questions pertaining to those who had contributed to the Fund, as to which he now responded affirmatively to a suggestion in a question put by the court that such a disclosure might tend to incriminate him. Thereafter he stood definitely on this claim of privilege under the Fifth Amendment. When the hearing was resumed on July 5 the court after further questioning ordered the production of the books and records of the Fund which Field had described. Again he refused, alleging the same privilege. The court then made a specific direction that the records be produced and the questions answered. The witness continued his refusal and the citation for contempt followed.

Next Hunton was sworn, having also appeared without subpoena upon being advised that the matter was before the court. He likewise admitted his trusteeship of the Bail Fund. Beyond this, however, he would not go; he declined, on grounds of the privilege against self-incrimination, to answer numerous questions concerning the nature and location of the Fund's records, acquaintanceship with the four fugitives, the time when he had last seen them, whether the signatures on the bond or trusteeship agreements were his, and even whether or not he knew what records the Bail Fund kept. Directions to produce such records were variously answered with a plea that he had no control over them and, later, with a plea of the privilege. Specific directions to answer the questions and produce the books were ignored and he also was sentenced for contempt.

When Hammett appeared on July 9 he would admit nothing; he met all questions, including his trusteeship of the Fund, the signatures on the minute book (which Field had produced), his knowledge of the fugitives, and the nature of the books of the Fund, with the same plea. After the court's overruling of the plea and his continued refusal, he too was sentenced for contempt.

Appellants seek reversal here on two basic tenets: that the court had no jurisdiction to conduct the inquiry, and that the appellants were protected by their privilege against self-incrimination under the Fifth Amendment which they had validly asserted.

1. Jurisdiction of the District Court

Appellants' vigorous attack on the court's jurisdiction even to institute and prosecute the inquiry is based upon the premise that the matter concerned a possible crime against the United States. It is the exclusive province of the executive arm of government, they contend, to investigate such matters and, if facts justify, submit them to the courts through the process of grand jury indictment after review of the evidence. The precedents upon which they rely are cases where duties of investigation or of acting as a "one-man grand jury" were held improperly granted or "delegated to" the courts. See, e. g., In re Richardson, 247 N.Y. 401, 160 N.E. 655; In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682.

But we think this argument misses the real point as to the court's authority to take steps to effectuate its own decrees. True, there may have been crimes committed in connection with the flight of the fugitives, as under the Harboring Act, 18 U.S.C. §§ 1071, 1072; and the grand jury investigation which led to the contempt orders reviewed in the companion cases was obviously natural and desirable in this area. But the possibility of accusation and prosecution under a statute defining a crime does not offer or suggest any immunity for violating the direct mandate of a

court; two different powers are involved, though the acts and events may be the same or interwoven. And we suggest that any conception restricting a court from taking even such limited steps to effectuate its decrees as investigating the reasons for noncompliance is not only novel, but abhorrent to any idea of effective justice. Carried to its logical conclusion it would mean that a court cannot issue execution or supplementary writs to carry its judgments, civil or criminal, into effect, but must await the chance action of some outside agency; it would also mean that it cannot issue warrants for the detention of the fugitives themselves. Actually of course courts have always exercised such powers; specific instances alone, and not the broad principle itself, have been challenged. True, the court may call upon the executive to assist its authority or carry out its mandate; but that its mandate must be obeyed, whether or not effectuated by enforcing officers of another arm of the government, even to the forfeit of human life if necessary, is quite clear. For this reason a federal officer executing the process of a United States court, or even merely guarding the person of a federal justice, is immune from state prosecution for a homicide committed in performance of these duties. See In re Neagle, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55, and cases cited; Ex parte Jenkins, Fed.Cas.No.7,259, 2 Wall.Jr. 521; Ex parte Turner, Fed.Cas. No.14,246, 3 Woods 603; Beckett v. Sheriff Harford Co., C.C.D.Md., 21 F. 32; and cases collected in 65 A.L.R. 732.

 Mr. Justice Reed, in his opinion cited above, succinctly answers appellants' argument as to the District Court's jurisdiction thus [193 F.2d 90]: "District Courts of the United States have jurisdiction of all offenses against the laws of the United States. 18 U.S.C. § 3231. They 'may issue all writs necessary or appropriate in aid of their respective jurisdictions agreeable to the usages and principles. of law.' 28 U.S.C. § 1651. 'The jurisdiction of a court is not exhausted by the rendition of its judgment, but continues until that judgment is satisfied.' Wayman v. Southard, 10 Wheat. 1, 23, 6 L.Ed. 253.

Under ancient practice bench warrants are issued on indictments to bring defendants before the court for trial, and after violation of bail, either before or after conviction, warrants issue in order that a judgment may be executed. There can be no doubt of the power of the court to direct the bench warrant for the arrest of the four fugitives from justice in the case of Dennis et als." We agree.

 "Furthermore, it is fundamental that federal courts, in common with other courts, have inherent power to do all things that are reasonably necessary for the administration of justice, within the scope of their jurisdiction." Strohbar v. Dwinnell, 5 Cir., 29 F.2d 915, 916. See also Adams v. United States ex rel. McCann, 317 U. S. 269, 63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435. Here the court was properly continuing the effective disposition of the litigation initiated in the Dennis case; and examination of those who, as developed below, had constituted themselves "in truth, the jailers of the fugitives, responsible for their appearance," was a natural and appropriate step.

Mr. Justice Reed, who is author of the clause just quoted, also went on to point out that a mere witness was not entitled to question the court's jurisdiction: "It is enough if the court has a de facto existence and organization," citing Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L. Ed. 979; United States v. Shipp, 203 U. S. 563, 573, 27 S.Ct. 165, 51 L.Ed. 319; and United States v. United Mine Workers of America, 330 U.S. 258, 293, 67 S.Ct. 677, 91 L.Ed. 884. But the jurisdiction of the court seems to us so clear that we do not need to resort to this additional ground.

## 2. The Privilege Against Self-incrimination

 While the questions of the court to the appellants and the order for production of the Fund's books were all a part of the one attempt to obtain information as to those who had advanced money for the bail and might reasonably be expected to have knowledge of their whereabouts, a separation of the issue as to the books from that as to the questions is expedient. For

the Supreme Court has already given such clear guidance in the realm of organization records that we think no doubt can exist as to this first issue. In United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542, 152 A.L.R. 1202, the Court upheld the conviction for contempt of a custodian of books of a labor union, saying that official records held "in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination, even though production of the papers might tend to incriminate them personally." This is a settled rule, as shown by Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L. Ed. 771. The authority would seem particularly conclusive here, since these trustees of a declared trust, probably even more clearly than union officers, are acting as representatives of a group, rather than in their own purely private or personal interest.

The conclusions thus reached necessarily require affirmance of the convictions. What effect, if any, a possible error disclosed in the remainder of the record should have is not overclear. In Blau v. United States, 340 U.S. 332, 334, 335, 71 S.Ct. 301, 95 L.Ed. 306, the majority did not decide the point; but the minority opinion indicates that the entire conviction would still be valid, citing Pinkerton v. United States, 328 U.S. 640, 641, note 1, 66 S.Ct. 1180, 90 L.Ed. 1489; Hirabayashi v. United States, 320 U.S. 81, 84, 63 S. Ct. 1375, 87 L.Ed. 1774, though the appellants might apply under F.R.Cr.P., rule 35, 18 U.S.C., to the district court to exercise its discretion to reduce the sentences. While decision of the further issues in this case may therefore not be required, nevertheless since they are definitely presented by the record and may be of importance in the ultimate disposition of this case, as well as other like cases, we think consideration of the problem at this time is desirable.

The questions asked of these appellants fell into certain distinct patterns. We shall dismiss at once those which concerned their positions as trustees of the Fund, because Field and Hunton readily admitted their office, and Hammett (as well as they) was committed by the deed of trust and trustee vote, filing of which was required by the District Court for acceptance of the bail originally. Nor need we stop as to those questions which sought to locate and identify the books; for these were proper under the precedents. Once custodianship of the books was admitted, the custodian had no privilege as to questions "auxiliary to the production," and was obligated not merely to produce them, but also to make their use in court possible "without requiring other proof than his own." United States v. Austin Bagley Corp., 2 Cir., 31 F.2d 229, 234, certiorari denied Austin-Bagley Corp. v. United States, 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002; Pulford v. United States, 6 Cir., 155 F.2d 944, 947. So far, it is clear, there was no breach by the court of the constitutional privilege; and Hunton and Hammett, who refused to answer even these questions, were properly held in contempt. Remaining for consideration are two important series of questions: as to what the books would reveal and particularly as to the names of donors to the Bail Fund; and as to any clue or information appellants might have bearing on the whereabouts of the fugitives. All three appellants refused to answer the first series of questions. Field answered the latter series, but Hunton and Hammett did not.

■ So far as Field's original refusal to disclose the names of donors to the Fund was based on some desire to shield those persons, it manifestly cannot stand. So the Supreme Court explicitly ruled as to names of party members in Rogers v. United States, 340 U.S. 367, 371, 71 S.Ct. 438, 95 L.Ed. 344. For the privilege is a personal one which cannot be interposed to protect others from possible criminal prosecution. United States v. Murdock, 284 U.S. 141, 148, 52 S.Ct. 63, 76 L.Ed. 210, 82 A.L.R. 1376; Hale v. Henkel, 201 U.S. 43, 69, 26 S.Ct. 370, 50 L.Ed. 652. Legally the controlling principle is clear. Practically the same result is at least indicated, for a fund owned by "a great many hundreds of individuals," as Field said, each holding a certificate of deposit or receipt, cannot long remain secret when loss-

es deplete or exhaust it and some protection of the depositors becomes imperative. Excuse, if any, must therefore be found in the claim of the constitutional privilege by the individual involved and in the particular situation.

The privilege against self-incrimination is of course one of the great constitutional rights, not lightly to be pushed aside. Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118; Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170; Smith v. United States, 337 U.S. 137, 150, 69 S.Ct. 1000, 93 L.Ed. 1264. Consideration of its exercise here must be approached, however, in the perspective before the court at the time and freed of questions troublesome at earlier stages of this same litigation. As the thoughtful opinions of the various courts have demonstrated, the original prosecutions in the Dennis case presented serious problems of adjusting traditional views of freedom of expression to the need for guarding against a dangerous attack upon government itself. These are now all settled for this case by the final decision of our highest court; here we have to deal only with the pursuit of fugitive felons and how far those responsible to the court for their appearance may refuse pertinent information by claiming the privilege.[1] The rule applicable must be the same as with any other federal convicts and their bail; what we hold must necessarily have that generality of application.

■ Directly involved, too, is another constitutional right, that against "excessive bail" granted by the Eighth Amendment. For appellants' thesis, considered in detail below, comes to rest upon the contention that the surety's obligation is fixed and limited by the cash deposit made, or in effect that a charge of crime can be commuted into some stated sum of money, payment of which terminates all surety responsibility. Such a monetary evaluation of crime is definitely at variance with the settled principle that bail is to be only in such amount as "will insure the presence of the defendant,"[2] and, if pursued logically, will seriously prejudice the furnishing of bail pending trial, particularly in the case of crimes against the government's existence, where an amount so determined is sure to be high. Indeed, the many appeals now developing concerning high bail are perhaps a consequence of the vigorous pressing of such contentions which may already have weakened the traditional value of a bail bond with responsible surety.

■ So the basic question before us has been much argued in terms of waiver, with consideration directed to what each appellant may have done or not done toward waiving his privilege. We think, however, that this is a confining approach to the problem before us. Rather should the situation be viewed from the broader aspect of the nature and extent of the obligations originally assumed by these appellants. For all present intents and purposes they are to be regarded as the sureties, though only Dunn, the treasurer of

1. Mr. Justice Reed ruled that a witness before a court, not a party, cannot take exception to the materiality of the questions, citing Nelson v. United States, 201 U.S. 92, 114, 26 S.Ct. 358, 50 L.Ed. 673. While we agree, we think the questions *prima facie* material to the inquiry the court was making. Some persons had made a large total investment in the appearance of these fugitives before the court when required; it would be proper to ascertain how concentrated was this investment and whether or not the larger investors at least had any knowledge of the flight of their principals or had taken any steps to endeavor to produce them.

2. F. R. Cr. P., rule 46(c), continuing: "having regard to the nature and circumstances of the offense charged, the weight of the evidence against him, the financial ability of the defendant to give bail and the character of the defendant." See also United States ex rel. Rubinstein v. Mulcahy, 2 Cir., 155 F.2d 1002; United States ex rel. Potash v. District Director of Immigration and Naturalization, 2 Cir., 169 F.2d 747, 751; United States ex rel. Pirinsky v. Shaughnessy, 2 Cir., 177 F.2d 708; Zydok v. Butterfield, 6 Cir., 187 F. 2d 802, 804; Williamson v. United States, 2 Cir., 184 F.2d 280; People of the State of Ill. ex rel. Sammons v. Snow, 340 Ill. 464, 173 N.E. 8, 72 A.L.R. 798, with annotation at page 801.

their group, actually signed the bonds. The court required the nature of the trust to be disclosed through the documents mentioned above, and they thereby all accepted the obligation for the use of the Bail Fund for such bail as might be required at all stages of the pending prosecution and until its final termination.

In his Commentaries, Blackstone sets forth the traditional "nature" of bail as "a delivery, or bailment, of a person to his sureties, upon their giving (together with himself) sufficient security for his appearance; he being supposed to continue in their friendly custody instead of going to gaol." 4 Bl.Comm. 297. So the Supreme Court expressed a like thought in refusing to hold a person immune from arrest on an indictment for which he had already forfeited bail. Mr. Justice Story said: "A recognizance of bail, in a criminal case, is taken to secure the due attendance of the party accused to answer the indictment, and to submit to a trial, and the judgment of the court thereon. It is not designed as a satisfaction for the offense when it is forfeited and paid; but as a means of compelling the party to submit to the trial and punishment which the law ordains for his offense." Ex parte Milburn, 9 Pet. 704, 710, 9 L.Ed. 280. This same conception is repeated in many cases which find involved a "moral risk as well as the material risk." Concord Casualty & Surety Co. v. United States, 2 Cir., 69 F. 2d 78, 81, 91 A.L.R. 885, where Judge Swan pointed out: "If the court lacks confidence in the surety's purpose or ability to secure the appearance of a bailed defendant, it may refuse its approval of a bond even though the financial standing of the bail is beyond question." To this point he cited United States v. Lee, D.C.S.D. Ohio, 170 F. 613, 614, where the court made a particularly strong statement as follows: "In the theory of the law, by a recognizance of bail in a criminal action, the accused is committed to the custody of the sureties as to jailers of his own choosing, and is so far placed in their power that they may at any time arrest him upon the recognizance and surrender him to the court, and are bound, at their peril, to see that he obeys the court's order."

Among other cases which may be cited to the same effect are United States v. Ryder, 110 U. S. 729, 4 S.Ct. 196, 28 L.Ed. 308; Reese v. United States, 9 Wall. 13, 21, 19 L.Ed. 541; Taylor v. Taintor, 16 Wall. 366, 371, 21 L.Ed. 287; Cosgrove v. Winney, 174 U.S. 64, 66, 19 S.Ct. 598, 43 L.Ed. 897; United States v. Simmons, C. C.S.D.N.Y., 47 F. 575, 14 L.R.A. 78; United States v. Caligiuri, D.C.N.J., 35 F. Supp. 799, 801. It was this line of compelling precedents upon which Mr. Justice Reed relied in holding these trustees "in truth * * * jailers of the fugitives, responsible for their appearance."

Appellants urge that this is an older concept which must yield to the view, implicit in modern statutes allowing the deposit of cash or securities in lieu of a bail bond, that a surety's duty is a pecuniary and wholly impersonal one. It is of course true that many states have such statutes and state courts in many jurisdictions have relied upon them to settle in favor of the surety the mooted point as to the validity of an indemnity bond given by a prisoner to his surety. Western Surety Co. v. Kelley, 27 S.D. 465, 131 N.W. 808; see Note, 35 Va.L.Rev. 496, 502. Contra Sansome v. Samuelson, 222 Minn. 417, 24 N.W.2d 702, 170 A.L.R. 1158, with annotation 1161–1170; United States v. Simmons, C.C.S. D.N.Y., 47 F. 575, 14 L.R.A. 78. In Leary v. United States, 224 U.S. 567, 32 S.Ct. 599, 600, 56 L.Ed. 889, Ann.Cas.1913D 1029, the Supreme Court upheld such an express agreement, relying upon New York law and citing New York decisions "as founded in good sense." Appellants stress this decision and quote from it certain references to the impersonal character of the surety's obligation. But these expressions are taken out of the context, which was a favoring opinion as to a surety *as against his principal,* and not as against the government. Greater freedom to the surety in this regard may well be a strengthening factor in the bail relationship; at any rate we are clear that this favor cannot be held to overturn the long and settled line of cases to which we have referred.

Moreover, the Rules, we think, make the point clear. Thus F.R.Cr.P., rule

46(d) provides that "A person required or permitted to give bail shall execute a bond for his appearance. One or more sureties may be required, cash or bonds or notes of the United States may be accepted and in proper cases no security need be required." The Committee Note states that "This rule is a restatement of existing practice, and is based in part on 6 U.S.C. A. § 15"—the statute which provides for the deposit of bonds or notes of the United States in lieu of a recognizance or bond. This shows the Committee's interpretation of the power thus given to require sureties; of course if there be thought to be any difference between the rule and the statute, the rule prevails under the terms of the rule-making act, 18 U.S.C. § 3771, formerly § 687.

Again the same principle appears in another rule much relied on by appellants, although it appears to us to have a different significance. That is the provision of F.R.Cr.P., rule 46(g), that "A surety may be exonerated by a deposit of cash in the amount of the bond or by a timely surrender of the defendant into custody." This, too, is said in the Note to be "a restatement of existing law and practice," based in part on 18 U.S.C. § 599, now § 3142, providing for the surrender of his principal by the bail. The latter part of this is old. "The bail have their principal on a string, and may pull the string whenever they please, and render him in their discharge." Anonymous, 6 Mod. 231, quoted in Taylor v. Taintor, 16 Wall. 366, 371, 372, 21 L.Ed. 287. But the provision for the deposit of cash is significant; it shows quite clearly that the surety owes an obligation beyond the mere deposit for which some method of exoneration in fairness must be devised. If the utmost extent of his obligation is to lose his money, he will hardly put it up as exoneration before loss is shown. Under the rule, however, the surety can get exoneration from his continuing responsibility as jailer; and the court may then order different and perhaps better bail. Thus in United States v. Flynn, 2 Cir., 190 F.2d 672, 673, this court spoke approvingly of the revocation of bail given by these trustees in other cases before the District Court because they

"had shown, by refusing to answer questions relating to the bail fund and their connection with the defendants, a disregard of their responsibilities as sureties for the discovery and presentation before the court of their principals."

Such is the nature of the obligation assumed by these appellants when they provided for the bonds originally in the District Court. It is obvious that exercise of their constitutional privilege completely sets at naught their definite obligation. This is perhaps most clearly demonstrated in the case of Hammett, who refused to lend the court's process assistance of any kind.

It is not a new thing to hold that the privilege may be limited in various ways by a previous obligation otherwise assumed. Examples of limitations validly set upon its exercise are found in the various requirements for the disclosure of information set by the state as a correlative of the pursuit of certain activities. Thus doctors must report deaths and their causes, druggists must show their prescription lists, mine owners must report details of accidents in their mines, and motor vehicle operators must report details of collisions on the highway. Ex parte Kneedler, 243 Mo. 632, 639, 147 S.W. 983, 40 L.R.A.,N.S., 622; People v. Rosenheimer, 209 N.Y. 115, 102 N.E. 530, 46 L.R.A.,N.S., 977; State of Kansas v. Razey, 129 Kan. 328, 282 P. 755, 66 A.L.R. 1225, with annotation at 1228; Ule v. State of Indiana, 208 Ind. 255, 194 N.E. 140, 101 A.L.R. 903, with annotation at 911; Commonwealth v. Joyce, 326 Mass. 751, 97 N.E.2d 192 (citing cases). Various examples are also given in Shapiro v. United States, 335 U.S. 1, 17–19, 59–65, 68 S.Ct. 1375, 92 L.Ed. 1787, which is itself important because of its holding that the records required to be kept by OPA regulations under the wartime price controls were not subject to the privilege. See also United States v. Darby, 312 U.S. 100, 125, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453.

Dean Wigmore states that this privilege, like others, should be subject to relinquish-

ment by contract, express or implied, in advance or retrospectively, and cites in support such cases as Green v. Weaver, 1 Sim., Ch., 404; Hickman v. London Assur. Corp., 184 Cal. 524, 195 P. 45, 18 A.L.R. 742; Swedish-American Tel. Co. v. Fidelity & Casualty Co., 208 Ill. 562, 70 N.E. 768. See 8 Wigmore on Evidence § 2275, 3d Ed.1940. He also says that such an agreement may be required of, and enforced against, public officers, § 2275a; and see also Seabury, Address at American Law Institute 1932, 18 A. B.A.J. 371, 372. On the other hand, certain state court opinions have assumed that police officers may stand on their constitutional privilege in refusing to answer questions concerning a violation of their official duty. Christal v. Police Commission, 33 Cal.App. 2d 564, 92 P.2d 416; In re Lemon, 15 Cal. App.2d 82, 59 P.2d 213; Drury v. Hurley, 402 Ill. 243, 83 N.E.2d 575. These cases may fall short of clear precedents, since they deal with the issue collaterally by holding that such officers violate their duty in making the claim and may properly be discharged because of such violation. Yet there seems no reason to quarrel with the suggestion, since obviously the principle cannot be pressed to hold that all acceptance of office carries an obligation to perform without resort to the constitutional protection. Else a public officer or judge must disclose all bribes, a bank official all embezzlements, indeed, a citizen all violations of his obligation to good citizenship. Louisville, H. & St. L. Ry. Co. v.

Schwab, 127 Ky. 82, 105 S.W. 110; Scholl v. Bell, 125 Ky. 750, 102 S.W. 248. Naturally the obligation deduced from the accepted activity must be close and direct, and not the merely general burden of either citizenship or due performance of accepted office. More apposite is the holding that direct waiver of immunity may constitutionally be required of public officials, including police officers, and applied even as to acts before the passage of the statute. Canteline v. McClellan, 282 N.Y. 166, 25 N.E.2d 972. The question thus appears to be one of the directness of the obligation undertaken upon entry into the office.

In the present case the obligation assumed by these appellants to act as jailers for their principals was much more direct and immediate than any undertaken by wholesalers and retailers who continued in their respective businesses after the OPA regulations upheld in Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787, went into force. There they had little voluntary choice; here choice was complete.[3] Here, too, nullification of the obligation by resort to the privilege is yet more complete than that adverted to in the Shapiro opinion. Moreover, there is a certain anomaly, realistically viewed, in a ruling which, while upholding the major contention as to production of the books, sticks in the bark as to the implementing questions concerning their contents.[4] We conclude that questions directly pertinent to the whereabouts of the fugitives or to clues to

3. The element of choice is stressed, for example, in cases such as People v. Rosenheimer, supra, 209 N.Y. 115, 102 N.E. 530, 46 L.R.A.,N.S., 977, against interesting dissent and opposing views below, 70 Misc. 433, 128 N.Y.S. 1093, Id., 146 App.Div. 875, 130 N.Y.S. 544, relying upon the privilege involved in the operation of a motor vehicle on the highway and thus supporting a statute making it a felony for a motor vehicle operator to leave the scene of an accident without stopping and giving his name, residence, and license number, or, if no police officer is about, of reporting the accident to the nearest police station.

4. Several recent and thoughtful articles have stressed the desirability of disclosures of the type we have been discussing and the availability of other less controversial types of constitutional guaranty for protection of individual liberties in this area, e.g., freedom of speech of the First Amendment and the prohibition against illegal search and seizure of the Fourth Amendment. See, e.g., Meltzer, Required Records, the McCarran Act, and the Privilege Against Self-Incrimination, 18 U. of Chi.L.Rev. 687; Morgan, The Privilege Against Self-Incrimination, 34 Minn.L.Rev. 1; Quasi Public Records and Self-Incrimination, 47 Col.L.Rev. 838; Davis, The Administrative Power of Investigation, 56 Yale L. J. 1111, 1137, 1138, 1154; The Privilege Against Self-Incrimination, 49 Yale L.J. 1059, 1067–1069, 1078. See also the broad provisions of the A. L. I. Model Code of Evidence, Rules 206, 207, 1942.

trace down their whereabouts cannot be defeated by claim of the privilege; else the obligation assumed is meaningless (and doubly so if all possibility of penalty is limited to some merely future prohibition of further bonding or vague threat of non-existent damages). And it does not seem to us that the questions here asked went beyond these limits. Certainly the objective of the judge in asking them was clearly within these limits; answers to them, while only remotely and at best unclearly dangerous to appellants, were potentially capable of providing direct assistance to his inquiry. Hence, repeated refusals in repudiation of the definite responsibility thus assumed were properly visited with the customary penalties exacted for defiance of a court acting in the normal exercise of its appropriate functions.

Convictions affirmed.

FRANK, Circuit Judge (concurring as to affirmance but dissenting as to one ruling).

1. I entirely agree that we must affirm the convictions on the grounds that the court had jurisdiction, and that the defendants had no constitutional privilege either with reference to producing the Bail Fund's records or as to oral testimony concerning matters "auxiliary to the production" of those records.

2. But I disagree on one point decided in the last few paragraphs of my colleagues' opinion: The defendants were asked to testify orally in answer to some other questions which—so my colleagues concede—(1) would tend to self-incrimination, (2) were not at all "auxiliary" to the production of the records, and (3) would ordinarily be covered by the anti-self-incrimination constitutional privilege. Peculiarly within that category were questions about when the defendants last saw, or about their acquaintance with, the Dennis-case refugees. This is precisely the kind of question the reply to which the Supreme Court, earlier this year, held privileged as tending to self-incrimination, in a case much like this. See Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118. There the witness Hoffman refused, when asked, to give testimony as to his connections with fugitives

for whom bench warrants had been issued. The questions to which the privilege applied were, 341 U.S. at page 481, 71 S.Ct. at page 816:

"Q. Do you know Mr. William Weisberg? A. I do.

 * * * * * *

"Q. When did you last see him? A. I refuse to answer.

"Q. Have you seen him this week? A. I refuse to answer.

 * * * * * *

"Q. Do you know where Mr. William Weisberg is now? A. I refuse to answer."

The following, almost identical questions asked the defendant Hunton in the present case, are held today by my colleagues to be without the privilege:

"Q. Do you know Henry Winston? A. I cannot answer the question on the ground that the answer may tend to incriminate me.

"Q. Do you know where Robert G. Thompson, Gilbert Green, Gus Hall or Henry Winston are presently located? A. I do not.

"Q. When did you last see Robert G. Thompson? A. I decline to answer on the ground that the answer might tend to incriminate me.

"Q. When did you last see Gilbert Green? A. I decline to answer on the ground that the answer might tend to incriminate me.

"Q. Have you seen Robert G. Thompson since Thursday of last week? A. I decline to answer on the ground that the answer might tend to incriminate me.

"Q. Have you seen the defendant Gilbert Green since July 5? A. I decline to answer on the ground that the answer might tend to incriminate me."

My colleagues' position as to those questions is this: The defendants bargained away the privilege many months before any judicial inquiry arose, when they voluntarily became sureties and thereby impliedly promised to disclose to the government any information which might aid in bringing into custody the convicted persons for whom the defendants had gone bail. I have no doubt that the defendants did assume that

obligation. Doubtless, too, the effective assertion of the privilege would be flatly inconsistent with that obligation and would be a breach of it. But I do not accept my colleagues' thesis that a court may criminally punish a man who breaks such a contract by which he agrees, long in advance, to surrender his anti-self-incrimination privilege. In short, I think that no such advance (pre-inquiry) contract can validly destroy the privilege (not to give oral self-incriminating testimony) when asserted by a witness in response to questions during a proceeding, if that privilege would otherwise apply.

No case relating to bail sureties, or other persons, has been cited by my colleagues in support of their position. Nothing in any of the previous decisions relative to this Bail Fund bears on the subject.[1] My colleagues' ruling is a startling innovation; it marks the deepest inroad on the privilege to this date. In this particular case, that ruling may seem to have relatively little consequence; for, even if my view prevailed, it would mean only that the defendants would be entitled to urge the trial judge to use his discretion to reduce their sentences.[2] When, however, the defendants have served their sentences, they may again be asked the same questions and again be held in contempt, if they repeat their refusals to answer. Moreover, the majority ruling on this point may have wide precedential consequences. All this explains why I shall spell out my reasons for disagreeing on this issue.

I think that, as I shall try to show, my colleagues have erroneously applied (1) cases admittedly having nothing to do with oral testimony, and (2) cases holding that civil remedies (i.e., remedies other than criminal punishment) may be used, where one who asserts the privilege thereby breaks an obligation, voluntarily assumed, to testify orally.

I begin with the latest federal case on which my colleagues rely, Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787. I think that it plainly demonstrates that an advance voluntary assumption of an obligation to testify orally does not destroy the privilege. In the Shapiro case the Court was construing an OPA statute, 50 U.S.C.A. Appendix, § 922, which required those engaged in a business regulated by that Act both (a) to make and keep records open to inspection and subject to subpoena and (b) to "appear and testify" orally under oath at administrative inquiries. The Court held that the defendant, by engaging voluntarily in such a business, assumed the obligation of compliance with these requirements. It also held that the statute made "public records" of the required records; that therefore the defendant had no constitutional privilege with respect to their production; and that, accordingly, on compulsorily producing them, he was not entitled to immunity from prosecution on the basis of the facts disclosed therein, despite the statutory immunity provision in § 202(g) of the OPA statute. The immunity thus conferred, said the Court, was only "co-terminous with what otherwise would have been the constitutional privilege." But, significantly, the Court carefully differentiated the lack of effect on the privilege of the obligation to testify assumed by the defendant. The Court said, 335 U.S. 1 at page 27, 68 S.Ct. 1375, at page 1389, "Of course all *oral* testimony * * * can properly be compelled only by exchange of immunity for waiver of privilege."[3]

1. Judge Swan, in United States v. Field, 2 Cir., 190 F.2d 554, based his denial of bail solely on the refusal to turn over the books and records. Judge L. Hand followed Judge Swan, United States v. Hunton et al., 2 Cir., 190 F.2d 556. Justice Reed did the same; Field v. U. S., 2 Cir., 193 F.2d 86, 91. In U. S. v. Flynn, 2 Cir., 190 F.2d 672, we did not have before us the issue of jailing the Bail Fund Trustees for contempt.

2. That is, to reduce the sentences to the extent that he imposed them for refusal to answer the questions here being discussed.

Field's sentence has already run. Because of St. Pierre v. United States, 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199, I doubt whether we may pass on his conviction, since the appeal seems to be moot, although I find it somewhat difficult to reconcile St. Pierre with Southern Pac. Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310.

3. Emphasis as in original.
Frankfurter, J., dissenting in Shapiro v. United States, 335 U.S. at page 42, 68 S.Ct. at page 1396, confirmed the dis-

To summarize: The defendant Shapiro took on two obligations—(1) to keep and produce records and (2) to testify orally. The first was not at odds with the privilege, because the records had been made "public records." But the Supreme Court said that the second was within the privilege, which means that the privilege not to testify orally could not be destroyed by Shapiro's previous voluntary assumption of an obligation so to testify. As a result, Shapiro could have been compelled to testify orally as to matters tending to self-incrimination only because of the correlative statutory grant of immunity. But, in the case on appeal before us here, as there was no grant of immunity to the defendants, their privilege remained, notwithstanding their implied promise to make disclosure.

The distinction, laid down in the Shapiro case, between production of required records and compulsion of oral testimony has been reaffirmed in our own court: "We recognize that if Daisart had been required to submit reports pursuant to OPA's record-keeping requirements, then Smith could not claim immunity if compelled to produce them. Shapiro v. United States, 68 S.Ct. 1375. We think, though, the production of records must be distinguished from oral testimony as to what the records would contain, had they been produced. * * * [T]he very matter that would incriminate had to be forced from the lips of the defendant himself, rather than obtained from the records or books." United States v. Daisart Sportswear, 2 Cir., 169 F.2d 856, 862, reversed on other grounds, Smith v. United States, 337 U.S. 137, 69 S.Ct. 1000, 93 L.Ed. 1264.

My colleagues in now wiping out this distinction rely on (1) state court cases which, like the Shapiro case, sustained, as valid, in the face of the privilege, statutes requiring druggists or others to keep records open to public or official inspection and to produce them in court,[4] or (2) cases requiring certain kinds of oral reports to be made to the police.[5] But in these cases the state courts themselves have carefully pointed out, as a basis of sustaining those statutes, that the statutes made no attempt to compel the reporter, against an assertion of his privilege, to testify in court as to the contents of such reports.[6] I think that not

tinction: "The Court supports * * * the 'short answer' that the immunity provided does cover compliance with any of those requirements as to which a person would have been excused from compliance because of his constitutional privilege. * * * Plainly, the Court construes § 202(g) as according immunity only to oral testimony under oath."

4. See, e.g., State v. Davis, 108 Mo. 666, 18 S.W. 894; People v. Henwood, 123 Mich. 317, 82 N.W. 70.

5. See, e. g., Ex parte Kneedler, 243 Mo. 632, 147 S.W. 983, 40 L.R.A.,N.S., 622; People v. Rosenheimer, 209 N.Y. 115, 102 N.E. 530, 46 L.R.A.,N.S., 977.

6. "The statute is a simple police regulation. * * * It does not attempt in terms to authorize the admission of the information as evidence in a criminal proceeding." Ex parte Kneedler, supra note 5, 243 Mo. at page 639, 147 S.W. at page 984. "I might hesitate * * * in upholding a statute which required the operator of a vehicle to appear and be examined as a witness on the trial of a criminal prosecution against himself for his conduct in the occurrence." Peo-

ple v. Rosenheimer, supra note 5, 209 N. Y. at page 122, 102 N.E. at page 532. See also People v. Creeden, 281 N.Y. 413, 24 N.E.2d 105, 107; Bowles v. Amato, D.C.Colo., 60 F.Supp. 361, 363.

It is worth noting that many of the state reporting statutes, like the ones above, have been upheld on the ground that the scanty and non-incriminating nature of the information required, i.e., driver's identity and license number, constituted no real threat to the informer. See Ex parte Kneedler, supra note 5, 243 Mo. at page 639, 147 S.W. 983; Commonwealth v. Joyce, 326 Mass. 751, 97 N.E.2d 192, 194; State v. Davis, supra note 4, 108 Mo. at page 671, 18 S.W. 894. See Mason v. United States, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198, the privilege does not extend to answers to questions too remote and unsubstantial; Swingle v. United States, 10 Cir., 151 F.2d 512, compulsory identification alone does not violate the privilege. A statute requiring a "full report" to a police officer of details of motor accidents has been held unconstitutional. Rembrandt v. City of Cleveland, 28 Ohio App. 4, 161 N.E. 364.

There is an important practical difference between these reporting statutes,

the slightest intimation in those cases justifies my colleagues' interpretation of them as holding that one required by statute to make such reports loses his privilege, in a judicial inquiry to which the contents of the report are relevant, to refuse to give self-incriminating oral testimony. Such a result is, I believe, without precedent in this country. The Supreme Court, in fact, took all these state court reporting statutes into consideration in Shapiro v. United States, 335 U.S. 1, 18, 68 S.Ct. 1375.[7] Yet it was adamant in insisting that the privilege still applied to all oral testimony.

My colleagues consider it an "anomaly" to differentiate the production of documents from "questions concerning their contents." Even had the questions asked of the defendants here been thus restricted, I would not regard the distinction as anomalous; more to the point, the Supreme Court does not. But whatever there may be of anomaly in applying the privilege to questions concerning the books' contents vanishes with respect to the questions asked here which were utterly unrelated to these contents, *i.e.*, questions about when the defendants had last seen the fugitives, and the like.

My colleagues do not cite, and I have been unable to discover, a single American case deciding that a statute can validly abolish the privilege with respect to giving oral testimony. Moreover, in the instant case, no statute required the defendants to report or make disclosures. Their obligation to disclose is wholly contractual, deriving by implication from their contract as sureties. No American case has been cited, and I can find none, to the effect that, by any advance contractual promise, the privilege can be abrogated. All the pertinent decisions hold the other way. Consider the case of a fiduciary. He patently owes an obligation, assumed when he becomes a fiduciary—an obligation which is at least as important as if embodied in an express contractual promise—to disclose to his beneficiary all dealings with the beneficiary's money or other property. Yet when a beneficiary has sued his fiduciary, it has been uniformly held in this country that the fiduciary may refuse to give self-incriminating oral testimony about such dealings, although the result may be seriously to impede or frustrate the obligation he unquestionably undertook voluntarily. See, e.g., Ex parte Berman, 105 Cal.App. 37, 287, P. 125; Vineland v. Maretti, 93 N.J.Eq. 513, 117 A. 483; Warren v. Holbrook, 95 Mich. 185, 54 N.W. 712. The inapplicability in these United States of the English case of Green v. Weaver, 1 Sim., Ch., 404, cited by my colleagues, is explained in Ex parte Berman, supra.

Very much in point are the cases relative to policemen and other public officers, for they involve contractual obligations owed to a government. A policeman, when he takes office, contracts in the most solemn manner conceivable—as signalized by his oath of office—to aid in the detection and apprehension of criminals. His solemn promise obviously includes a promise to give information to the government about the deeds of suspected criminals. Yet the courts, whenever the issue has arisen, have said, with no exception, that such an officer, if called in an inquiry concerned with facts squarely within the scope of the officer's sworn official duty, may efficaciously assert the privilege. See Christal v. Police Commission of San Francisco, 33 Cal.App.2d 564, 92 P.2d 416; In re Lemon, 15 Cal.App.2d 82, 59 P. 2d 213; Drury v. Hurley, 402 Ill. 243, 83 N.E.2d 575; Scholl v. Bell, 125 Ky. 750, 102 S.W. 248; cf. Claiborne v. United States, 8 Cir., 77 F.2d 682, 690. The courts, in such cases, fully acknowledging the official's obligation to testify orally, hold that the rem-

---

even those carrying criminal penalties for failure to keep such reports, and the abrogation of the privilege as to oral testimony. A man can be sent to jail only once for failure to keep certain records. But he can be imprisoned as many different times in as many different proceedings as he is asked questions about those reports, if he has no privilege as to their contents.

See United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037, to the effect that perhaps it may not be a violation of a record-keeping or report-making statute to exclude from the record or report any statements tending to self-incrimination.

7. See also Frankfurter, J., dissenting 335 U.S. at pages 59–65, 68 S.Ct. at pages 1404–1407.

edy for the breach is not criminal punishment, but removal from office. "We are not unmindful of the constitutional privilege * * * which may be exercised by all persons, including police officers, in any proceeding, civil or criminal [citations]. As we view the situation, when pertinent questions were propounded to appellants before the grand jury, the answers to which questions would tend to incriminate them, they were put to a choice which they voluntarily made. *Duty required them to answer. Privilege permitted them to refuse to answer. They chose to exercise the privilege, but the exercise of such privilege was wholly inconsistent with their duty as police officers.* They claim that they had a constitutional right to refuse to answer under the circumstances, but * * * *they had no constitutional right to remain police officers* in the face of their clear violation of the duty imposed upon them." Christal v. Police Commission of San Francisco, supra [33 Cal.App.2d 564, 92 P.2d 419].[8]

*Suppose a policeman who had been assigned to arresting the Dennis-case fugitive Thompson had been asked, just as one of the defendants here was asked: "When did you last see Thompson?" Suppose the officer, on the basis of the privilege, had refused to answer. The precedents all teach that he could not have been adjudged in contempt.*

In short, on the assertion of the privilege, the courts will not use criminal punishment as a means of compelling specific performance of a policeman's contractual obligation, but will approve other remedies for the policeman's breach of that obligation. So here: The defendants, because they have broken their contractual disclosure-obligation, may be rejected as sureties in future cases. Concord Casualty & Surety Co. v. United States, 2 Cir., 69 F.2d 78, 81, 91 A.L.R. 885; United States v. Lee, D.C.S.D.

Ohio, 170 F. 613; United States v. Flynn, 2 Cir., 190 F.2d 672. And if money damages can be proved, they can be held civilly liable. But I think that, no more than the privilege-asserting policeman, can they be jailed or fined for the breach.

My colleagues, I think, betray the weakness of their position by citing, as "apposite," Canteline v. McClellan, 282 N.Y. 166, 25 N.E.2d 972. Was anyone there held in contempt for refusal to answer questions? Not at all. The court there quoted with approval the passage from the Christal case which I quoted above. That alone should serve to show how inapposite is Canteline. But we have better proof of its irrelevance: There was before the court in that case an amendment to the New York constitution which, so far as New York proceedings were concerned, could have wiped out the privilege for public officials, or, indeed, for everyone. But that amendment did not modify the privilege; it did not provide that an official could be jailed if he refused to answer self-incriminating questions; it provided merely that an official exercising the privilege should lose his office.[9] In Canteline, the court applied that amendment.

The weakness of my colleagues' position further appears from their citation of Hickman v. London Assur. Corp., 184 Cal. 524, 195 P. 45, 18 A.L.R. 742, and Swedish-American Tel. Co. v. Fidelity & Casualty Co., 208 Ill. 562, 70 N.E. 768. In the Hickman case, the plaintiff, insured by the defendant, agreed in his policy to submit to an examination under oath in matters concerning the loss. Plaintiff brought suit on the policy, although, setting up his privilege, he had previously refused to disclose the required information to defendant. The court found that, as he had breached it, he could not recover on the policy. The court did not, however, attempt, by punishing the plaintiff, to coerce him into specifically per-

---

8. Emphasis added.

9. This new provision of the New York constitution was adopted in 1938, six years after Judge Seabury's speech (cited by my colleagues) advocating express relinquishment of the privilege by public officials as a condition of taking office. It illustrates the reluctance of the states, even by constitutional amendment, to abrogate the privilege for any class of citizens.

Yet New York has always required public officials to turn over public records in their custody. People v. Coombs, 158 N.Y. 532, 53 N.E. 527. The New York courts apparently see no "anomaly" in this distinction.

forming his contractual promise. The Swedish-American Tel. Co. case seems singularly inapposite, since it did not in any way involve the privilege against self-incrimination. In that case, the defendant company, insured by the plaintiff, had agreed that, in order to enable the plaintiff to check on the premiums earned, the defendant's books should be open to inspection by the plaintiff. In a suit, about the premiums, brought by the plaintiff, the court ordered defendant to produce for plaintiff's inspection the pertinent books of the defendant. The company was fined for civil contempt when it refused. It asserted that the discovery order was an unreasonable search and seizure. The Supreme Court of Illinois held that it was not. Nothing in that case relates to oral testimony.

All the precedents say that the self-incrimination privilege relative to oral testimony cannot be abolished constitutionally by advance contracts between private persons or even between a government and its crime-detecting officials. My colleagues are either ignoring those precedents or announcing a new doctrine which, for these purposes, puts contracts between governments and bail-sureties in a special class. But why such a special class? Why should a policeman, suspected of conspiracy with criminals whom he owes a duty to detect and arrest, have the benefit of the privilege despite his contractual duty, while a private bail-surety does not, although the harm such a surety, if allowed to keep silent, does to society and public morals is far less grave than that done by such a silent policeman? The fact that a policeman wears a uniform, advertising his status as a public servant, certainly does not mean that discharge of his obligation—a part of his "due performance of accepted office"—is not at least as "close and direct" as that of a private citizen acting as a surety. Nor is the surety's assumption of his obligation one iota more "voluntary" than is that of a policeman. In truth, one might plausibly argue that, in a practical sense, the surety's is less "voluntary"; for every man entering the police force thoroughly understands—more, he is told at length—that he is agreeing to detect and disclose crimes, whereas the implied disclosure-obligation of a private bail-surety is not generally well understood.

Since then, my colleagues' decision cannot reasonably rest on the notion of a special class, it must be taken as overruling the precedents, i.e., as holding that any advance contractual promise inconsistent with the exercise of the privilege extinguishes the privilege. If my colleagues' remarks about the need for a "close and direct" relation between promise and privilege leave any lingering doubts on this score, those doubts can be easily dispelled in this way: insert in a contract an express provision that one of the parties promises to divulge, to the other, information of a designated kind, and that the promissor surrenders his privilege with reference to oral testimony in so far as it would interfere with performance of that promise. Then, presto chango, up the chimney goes the privilege. Thus, if my colleagues' decision is generally accepted, the sole practical effect of the constitutional privilege will be to add a few words to a contract. So the high hopes of Madison and his fellows, expressed in this Fifth Amendment privilege, will end up in a rubber-stamp contractual clause. Especially will all government employees be stripped of the privilege—by contract. Before long, rubber-stamped out of existence, the privilege will be but a quaint item of antiquarian lore.

At any rate, my colleagues are today ruling that, by a contract with the government, any man can validly surrender that constitutional privilege long before there arises a judicial inquiry in which he is asked to give self-incriminating oral testimony under oath. I regard that ruling as at odds with the rationale of Supreme Court decisions in respect of other constitutional privileges.[10] Thus, for example, no one thinks an official

10. Johnson v. Zerbst, 304 U.S. 458, 58 S. Ct. 1019; Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309; United States v. Glasser, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Adams v. United States ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268.

or private person can validly contract away his right to trial by jury in any or all future criminal proceedings; he can, however, waive that right after indictment if then fully aware of what he is doing.[11] Advance abandonment is forbidden to prevent the right being thoughtlessly foregone. And, for like reasons, the same rule governs the advance abandonment of the privilege against oral testimony which tends to incriminate. Nevertheless, it might be suggested that, since the privilege is personal and may be relinquished by not asserting it when one is judicially questioned, it must be capable of disposition by a contract made long in advance of the questioning. The answer is that the courts hold that, because of public policy considerations, many important rights or privileges cannot be bartered away before the happening of events calling them into operation, but may be abandoned after such happening. "A promise not to plead the statute of limitations as a defense, or a promise to 'waive' the benefit of it, has generally been held to be contrary to the public interest if it is made at the time of the contract the enforcement of which is involved"; but such a promise "is valid if made after the accrual of the cause of action to be affected by it."[12] "A contractor cannot in advance bargain away such defenses as fraud and duress, and yet he can * * * validate a previous bargain that was induced by fraud or duress."[13] So with the disposition of a mortgagor's "equity of redemption."[14] Similarly, a worker cannot, in advance of their accrual, "contract out" his rights under a workmen's compensation statute.[15] A licensee under a patent may not lawfully agree in advance not to plead the invalidity of any patent if sued for infringement.[16] A provision of a contract is invalid by which one party agrees not to bring suit in or remove a suit to a federal court, although the right thus to sue or remove may be abandoned lawfully when the cause of action arises.[17] In the same way, to this extent, the self-incrimination privilege is inalienable—not to be yielded up—in advance.[18]

It seems to me that my colleagues have forgotten or have undervalued the stirring words uttered by the Supreme Court years ago: "* * * [A]ny compulsory discovery by extorting the party's oath, * * * to convict him of crime, or to forfeit his

11. Patton v. U. S., 281 U.S. 276, 312, 313, 50 S.Ct. 253, 74 L.Ed. 854.

12. Corbin, Contracts §§ 218, 1515 (1950). Cf. as to discharge in bankruptcy, Federal Nat. Bank v. Koppel, 253 Mass. 157, 148 N.E. 379, 40 A.L.R. 1443.

13. Corbin, Contracts § 1515 (1950).

14. Ibid.

15. See, e.g., Red Rover Copper Co. v. Industrial Commission, 58 Ariz. 203, 215, 118 P.2d 1102, 137 A.L.R. 740; Wass v. Bracker Construction Co., 185 Minn. 70, 240 N.W. 464.

16. Pope Mfg. Co. v. Gormully, 144 U.S. 224, 12 S.Ct. 632, 636, 36 L.Ed. 414. The Court there quoted with approval as follows from Crane v. French, 38 Miss. 503: "But there appears to be * * * a clear distinction between declining to take advantage of a privilege which the law allows to a party, and binding himself by contract that he will not avail himself of a right which the law has allowed to him on grounds of public policy. A man may decline to set up the defense of usury, or the statute of limitations, or failure of consideration to an action on a promissory note. But it would scarcely be contended that a' stipulation inserted in such a note, that he would never set up such a defense, would debar him of the defense if he thought fit to make it." See also Nachman Spring-Filled Corp. v. Kay Mfg. Co., 2 Cir., 139 F.2d 781.

17. Home Insurance Co. v. Morse, 20 Wall. 445, 22 L.Ed. 365. See Corbin, op. cit. supra note 12, § 1445; Restatement, Contracts § 558 (1932).

18. See In re Sales, 134 Cal.App. 54, 59, 24 P.2d 916, 919, where the court refused to find petitioners in contempt for asserting their privilege in violation of an agreement made with the district attorney to repeat at trial testimony given before the grand jury: "* * * there can be no contractual relationships with the witnesses * * * any agreement attempted to be made by him [the witness] as to whether or not he would testify would be wholly void and no rights whatever would be created thereunder."

property, is contrary to the principles of a free government. * * * [I]t is abhorrent to the instincts of an American. It may suit the purposes of despotic power, but it cannot abide the pure atmosphere of political liberty and personal freedom." Boyd v. United States, 116 U.S. 616, 631, 632, 6 S.Ct. 524, 533, 29 L.Ed. 746. Perhaps I am too old-fashioned, but I confess to being thrilled by those words. If we take them lightly, if by one after another encroachment we keep diminishing this constitutional privilege, a bit here and a bit there, I fear that we are likely to move rapidly, although unwittingly, in the direction of the unfree, authoritarian, kind of government whose principles have long seemed unprincipled to Americans. Eastern European history is proving once more the value of this privilege—proving that a law-enforcement system habitually trusting to compulsory self-incriminating disclosures cannot long escape recourse to bullying and torture.[19] It is noteworthy, too, that those American officials who, deplorably, use the brutalitarian Third Degree manifest unusually strong hostility to this privilege.[20] So that if, at times, this privilege protects the guilty, yet often it serves as a shield to the innocent.[21] I think my colleagues have left little of that shield.

To be sure, some persons—Wigmore is typical[22]—who are by no means brutalitarian look upon the privilege as largely one which fosters foolish sentimentality towards criminals, and wish that it were not incorporated in the Constitution. But even if that wish were warranted (which I gravely doubt) the way to realize it would be by amending the Constitution, not by judicial decisions which erase it.[23]

19. A wag, after reading that terrifying book "1984," might say that, if we do not watch out, we will find truth at the bottom of an Orwell.

20. In re Fried, 2 Cir., 161 F.2d 453, 459, 460, 1 A.L.R.2d 996.

21. 49 Yale L.J. 1059, 1078 (1940); People ex rel. Taylor v. Forbes, 143 N.Y. 219, 38 N.E. 303.

22. 8 Wigmore on Evidence 318, 319 (3d Ed. 1940).

23. See United States v. St. Pierre, 2 Cir., 132 F.2d 837, at page 847, 850, 147 A.L.R. 240 (dissenting opinion), certiorari granted St. Pierre v. United States, 318 U.S. 751, 63 S.Ct. 769, 87 L.Ed. 1126, but case dismissed as moot, 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199.